PAUL EUGENE SHACKELFORD *v*. STATE OF INDIANA.

[No. 1174S223. Filed June 21, 1976.]

*John F. Surbeck, Jr.,* Deputy Public Defender, of Fort Wayne, for appellant.

*Theodore L. Sendak,* Attorney General, *Walter F. Lockhart,* Deputy Attorney General, for appellee. .

DEBRULER, J.—Appellant, Paul Eugene Shackelford, was charged by indictment with first degree murder and charged by information with second degree murder. The first degree murder charge was withdrawn from the consideration of the jury, because there was no proof of any robbery occurring. Appellant was found guilty of second degree murder. Ind. Code § 35-1-54-1, Burns § 10-3404. He was sentenced to life imprisonment.

Appellant appeals on three grounds: (1) that the court committed reversible error in admitting into evidence certain photographs of the victim; (2) that the penalty of life imprisonment for second degree murder is unconstitutional pursuant to the Eighth Amendment of the United States Constitution and Art. 1, § 16 of the Indiana Constitution, because this penalty is as great as the penalty for first degree murder; (3) that the verdict was contrary to law and the State did not present sufficient evidence to support the verdict. In this section, appellant argues that the State failed to prove beyond a reasonable doubt appellant's intent to purposely kill, that the State failed to rebut appellant's claim of self-defense, that the jury ignored appellant's evidence of intoxication and resultant inability to form the requisite intent, and that the jury ignored all the evidence of mitigating circumstances and imposed the higher penalty of life imprisonment without support from the evidence.

The facts most favorable to the appellee-State show that appellant and the deceased, Russell Smith, had played a game of pool about 9:00 p.m., June 27, 1973. The two argued about making a bet before the game, and, when appellant won and Smith said they had never made the bet, they

argued more. Appellant spent most of the evening in the poolroom; Smith in the bar. However, they talked angrily again about 12:30 a.m., June 28, 1973. At that point, appellant came back in the poolroom and said, "I'm going to get my money."

About that time, Smith left the bar, and, seconds later, appellant left the poolroom. When the bartender asked him where he was going, he said, "It looks like I'm going across the street." About 1:00 a.m., one of the customers looked out the window at the parking lot to be sure one of the girls' new car was still there. He saw appellant and Smith talking. Then appellant came to the door of the tavern and leaned against it a minute or so before he left again. Another customer who looked out the window saw appellant looking down between the cars a while, then walking away. Later, appellant asked this witness to come across the street and help him get rid of some fingerprints. About 1:30 or 1:45 a.m., appellant ran through the tavern and out the back door, saying, "If anybody asks, you haven't seen me." But, about 2:15 or 2:30 a.m., he came down the street again, and witnesses recognized him and pointed him out to the police.

At 1:30, the deceased's body was found lying between cars in the parking lot. His face was so bloodied and mutilated, it appeared that he had been shot. Appellant admits kicking Smith once when he was on the ground.

Each of appellant's grounds for reversal depends in part upon the definition and elements of second degree murder. That statute reads:

"Whoever, purposely and maliciously, but without premeditation, kills any human being, is guilty of murder in the second degree, and, on conviction, shall be imprisoned in the state prison during life, or shall be imprisoned in the state prison not less than fifteen nor more than twenty-five years." Ind. Code § 35-1-54-1, *supra*.

Appellant first contends that the trial court committed reversible error in admitting three color photographs taken at the scene of the homicide and one color photograph taken

at the time of the autopsy. The first shows the victim lying between the parked cars with his personal effects scattered around him; the last three show his head and shoulders. These three are gruesome because the victim's face had been so badly hurt, but each shows his head and face from a different angle revealing different wounds and the photograph taken of the head at the autopsy shows the wounds after some of the blood had been wiped away.

In this case, the photographs were very relevant. The victim died from the severe blows to the chest area. These photographs showing the crushing and repeated blows to the head permitted the jury to draw an inference that appellant acted with purpose and malice. Not only did appellant beat or kick the victim in the chest, but he also kicked him in the face. No words could describe the victim's face, as it must have appeared to appellant after several blows. The blows to various parts of his head and to the head and chest indicate an intent to continue after all possible fear for his own safety had left appellant. These repeated blows permit an inference of intent to kill.

The fact that a photograph is of the victim on the autopsy table does not put the photograph "squarely within the prohibition" of *Kiefer* v. *State*, (1958) 239 Ind. 103, 153 N.E.2d 899. This photograph was taken before the autopsy, so that there are no incisions which might mislead the jury or cause the jury consciously or unconsciously to think that appellant caused greater injury to the victim's head than he did. Being very relevant and not distorted or misleading, the photographs were admissible.

Appellant's second argument is that the second degree statute which permits the trier of fact to impose a sentence for the lesser included offense equal to that for the greater offense is unconstitutional. Appellant asks that this Court reconsider its decision in *Brown* v. *State*, (1973) 261 Ind. 169, 301 N.E.2d 189.

We believe that that opinion was a correct statement of the law. A person who kills with purpose and malice, but without premeditation, has still killed intentionally and without justification or excuse. While the statute permits the trier to find that the offense was substantially less reprehensible and the act less likely to be repeated than other homicides, the statute also permits the trier to find the act of such a quality and so likely to be repeated that this defendant should be punished and confined during his life, just as he would have been punished and confined if his act were the result of premeditation. Neither the Constitution nor common sense requires the penalty to be less.

Appellant's third argument is that the verdict was not supported by sufficient evidence and was contrary to law, and that the court erred in denying his motions for a directed verdict. He bases this argument on six grounds: (1) and (2) that the State did not prove beyond a reasonable doubt that appellant killed Smith purposely and maliciously; (3) that the evidence showed that appellant acted in self-defense; (4) that the evidence showed that he acted in the heat of passion induced by sufficient provocation; (5) that he was too intoxicated to form an intent to kill; and (6) that the verdict of life imprisonment was not consistent with the mitigating evidence, but rather was the product of the gruesome photographs and the original charge of first degree murder.

Appellant argues that the State did not prove beyond a reasonable doubt that appellant killed Smith purposely and maliciously. Appellant did not kill Smith with a deadly weapon. However, a barehanded beating or a stomping may permit the jury to draw an inference of purpose and malice. This is especially true if the victim is weaker than his assailant or if the assailant continues to beat or kick the victim after he has fallen and is clearly no threat to the attacker. *McKinstry* v. *State*, (1975) 264 Ind. 29, 338 N.E.2d 636; *Covington* v. *State*, (1975) 262

Ind. 636, 322 N.E.2d 705; *Corbin* v. *State*, (1968) 250 Ind. 147, 234 N.E.2d 261; *Stice* v. *State*, (1949) 228 Ind. 144, 89 N.E.2d 915; Annot., 22 *A.L.R.2d* 854 (1952). The circumstances in which the homicide took place and the method of killing are common types of evidence tending to show state of mind. *McKinstry* v. *State, supra.*

"An act is done purposely if it is willed, is the product of a conscious design, intent, or plan that it be done, and is done with an awareness of probable consequences." An act is done with malice when it is done with "any evil design in general." In homicide, a purposeful killing is done with malice if it is done neither in self-defense nor in the heat of passion induced by sufficient provocation. *McKinstry, supra,* at 640, and cases cited therein.

In this case, the medical testimony indicated the number and severity of the blows appellant struck with his fists and boots. The doctor noted that the body had received severe crushing blows to the head, neck and chest, fracturing bones and severing two arteries, leading to death by loss of blood within minutes. He noted that there were six facial lacerations near the mouth, nose and eyes, the facial bones were fractured, the nose broken, the jawbones were fractured, the larynx was fractured, five ribs on the right side of the chest were fractured, two ribs on the left side, the sternal bone was fractured in two places, and two major arteries were completely severed so that blood filled the chest cavity immediately. He also noted that the deceased had a high alcohol content to his blood, so that he would have been in a confusional, or possibly a stuperous, state.

The physician compared the blow which would sever the arteries to that causing the death of people who are in automobile accidents and have "crushing injuries to the chest as a result of bouncing off a steering wheel." When asked if the fractures and injuries in the torso area, such as the fractures of the ribs, could have occurred when Smith fell,

the physician replied: "It would have to be a fairly, uh, much larger forces that an ordinary fall from the height of a man say standing to cause that number of fractures. It had to be a very severe blow or blows."

Smith was an elderly man, sixty-eight years old. He was extremely intoxicated. He was not armed. Appellant was twenty years old and had been trained as a Marine. The evidence would permit the jury to have determined that appellant's first blows knocked Smith to the ground and that he then started kicking him in the face and chest. The repeated, crushing blows would permit an inference that, at some point, appellant determined to continue kicking Smith, though he was aware that death would probably result from the continued blows. From this evidence, the jury could reasonably determine that appellant killed Smith purposely and maliciously.

The same evidence would permit the jury to find that the State had rebuttted any evidence of self-defense. Appellant was not in any danger of death or great bodily harm, nor was it error for the jury to conclude that appellant could not have perceived such an apparent danger. Certainly, after the first blows, appellant was no longer in any danger at all. *Kirg* v. *State,* (1968) 249 Ind. 699, 234 N.E.2d 465, and cases cited therein.

To have reduced the homicide to voluntary manslaughter, appellant must have killed Smith in a sudden heat induced by sufficient provocation. In this case, time for reflection intervened after the initial provocation, and the provocation was not sufficient to justify appellant's response. The victim had adamantly refused to pay his debt for three hours. He had called appellant names. The two had spent most of the evening apart and had talked to other people about other matters. About 12:30 a.m., appellant had stated that he intended to get his money, and, when the victim left, appellant indicated an intent to follow him. If Smith called appellant a "punk" or struck the side

of his head blurring his vision, neither act is adequate provocation for the response of repeated crushing blows after the victim had fallen.

Appellant argues also that he was too intoxicated to form the requisite intent to kill. Voluntary intoxication is not a defense to a criminal proceeding. However, if the State must prove that the defendant had a specific intent, then mental incapacity to form such an intent, whatever the cause, is a defense. Whether such a mental incapacity existed is a question of fact for the trier of fact. *Emler* v. *State*, (1972) 259 Ind. 241, 286 N.E.2d 408; *Stout* v. *State*, (1974) 262 Ind. 538, 319 N.E.2d 123.

In this case, evidence of mental incapacity was conflicting. It is without dispute that appellant had been drinking all during the evening. None of the people in the tavern were questioned about his degree of intoxication. One of the women testified that he was fully in control of himself that evening. The two police officers who talked to him for a few minutes before he was arrested testified that he was quite calm when the officers spoke to him, answered their questions quickly and responsively, and was oriented as to time and place.

An officer who interviewed appellant for processing about 2:30 to 3:00 a.m., that same morning, testified that appellant answered certain questions: name, date of birth, color of eyes and hair, but did not answer others. He acted out for the officers, despite their insistence that he should be quiet, the way in which he hit Smith's face with his fist. He was jittery and nervous and told the officers he needed a fix. This officer concluded he was under the influence of something, alcohol or drugs.

The other officer assisting with processing, testified that appellant was responsive, answered the questions he wanted to, knew that he was in jail, spoke intelligibly and had control of his motor functions.

An officer who questioned appellant at 2:00 p.m., thirteen hours after the homicide, twelve after appellant's arrest, testified that appellant was not completely dried out. Although appellant told him that he was suffering from withdrawal from heroin and cocaine, the officers observing him concluded that his habit could not have been great because his reaction was not severe. Furthermore, there was no question that appellant had been drinking heavily, and narcotics users seldom mixed narcotics and liquor. In this officer's opinion, appellant had a hangover. The evidence with regard to this interview is conflicting. Either the officers did not question him further because he was still under the influence of alcohol and drugs, or they questioned him and he told them about the events of the evening in detail.

On July 11, 1972, appellant made a statement to another detective. He said that he had drunk quite a bit but was not completely drunk. He said that he did not know what was going on completely; he was in a daze and did not remember a lot of what happened. At trial, appellant testified that he was "high" on narcotics and alcohol. He contrasted his state with that of Smith, who was "getting toward the drunk side."

It was the jury's task to determine if appellant was intoxicated to the point of being unable to form an intent to kill. The jury was instructed that the responsibility of appellant for the killing could be excused or reduced if the degree of inebriation was so great as to render appellant incapable of forming an intent to kill. The jury could have credited the testimony of the woman, the arresting officers, and the processing officers that appellant was rational, responsive, and in control of his speech and motor functions. They may also have considered the evidence that appellant stated an intent to get his money, an intent to follow Smith when he left, asked a friend to help him get rid of fingerprints, asked other friends not to admit that they had seen him that evening, and ran out the back entrance of the tavern when the police arrived and examined the body, as evidence that

appellant's state of mind would have permitted him to form an intent to kill. There was substantial evidence of probative value to support their conclusion.

The jury did not abuse its discretion in sentencing appellant to life imprisonment. Appellant cites the evidence of intoxication, repeated verbal provocation by the decedent, and assault by the decedent as factors the jury apparently ignored. The evidence of the degree of intoxication was conflicting; the provocation insufficient to explain the violent reaction.

Appellant contends also that the verdict was the product of the charge of murder in the first degree which was withdrawn and of the gruesome photographs. The judge informed the jury that the State had not proved that a robbery had occurred, that the State had not proved that anything of value had been taken from Smith. The indictment was read to the jury. The withdrawal of the charge with the judge's careful explanation may have alerted the jury to the importance of there being evidence of every element. Appellant was never charged with premeditated murder. While we agree with appellant that his sentence may have been, in part, a result of the jury's viewing the photographs, we have already determined that the photographs were accurate and relevant, as well to punishment as to malice and purpose. There is reason to believe that the jury sentenced appellant to life imprisonment because they found his act an outrageous response to small provocation from an elderly man over a five dollar bet. The evidence of brutality may have convinced the jurors that such a common life situation would bring the same response again.

The conviction is affirmed.

Givan, C.J., Arterburn, Hunter and Prentice, JJ., concur.

NOTE.—Reported at 349 N.E.2d 150.